May it please the court, I'm Michael McCabe. I represent Ms. Rucker, the petitioner appellant in this case. I'd like to address the issue surrounding the denial of a motion for new trial. I think that that's the meat and the heart and soul of this particular appeal, unless the court has a different preference. This, of course, arose as a result of the foreperson of the jury submitting a declaration to the trial court post-verdict, of course, indicating that he had consulted with outside sources, specifically a newspaper article and unnamed or unidentified internet articles and sources. And that these adversely impacted his viewpoint of the defendant. He also asserted in that same declaration that there were two jurors, identified as jurors two and nine, two females who had interjected their own personal experiences into the deliberative process. Specifically with respect to juror number nine, that she related that she had been sexually assaulted by a male in the past. And yet she had not utilized the weapon that is specifically a firearm against the individual as had petitioner. And therefore, petitioner's use of that firearm was unreasonable. Juror number two also made reference to a personal life experience and indicated that she had been physically assaulted by a male in the past. And that she too had not resorted to the type or level of violence against this particular individual which the petitioner had. In response to this allegation, of course, the people filed four declarations of other jurors, not jurors two and nine. And as the state concedes in its briefing, rather than contradicting the assertions of the foreperson with respect to the misconduct of those two jurors, as the trial court found, the declarations of these people supported in a number of respects, in substantial respects, on the allegations which were made with respect to them. And so when the petitioner appeared with counsel at the first hearing on August, I believe it was 5th of 2003, which was to be a continued hearing. The judge, rather than indicating, the trial judge, rather than indicating that the presumption of prejudice had applied and that he was going to require the people to bear the burden as was the law, went into a tirade as to the activities of the foreperson, indicated that he was once again doing everything he could to inject himself improperly into the proceedings. Wanted everyone to know that he was there. But more importantly, that by virtue of what he had said, he was obstructing justice. He had confessed to that. He should be held in contempt. And that admonished trial counsel, that is for the defendant, not to speak to him in the interim, that is the three-week period of time, until the next hearing. Well, let me, can I interrupt and just try to divide these issues, because I think they're two different issues. The trial judge found that the foreperson was an unbelievable witness. Who is in a better position to make that assessment than the trial judge? Well, I don't think that the trial judge can make an assessment without even hearing what it is that the person, that the individual has to say. There is no case out of this circuit or any other circuit which allows him to make credibility determination based simply upon the allegations which are being made by the individual in question. Well, but that's not just based on that. It's also the experience of having presided over the trial and having observed the foreperson on a daily basis. It's certainly more than what the person says in his declaration. Well, I understand that, but there was nothing specifically which was brought out at that particular time which adversely impacted upon the credibility, the visits to the jail had not been revealed to him as of yet. That was not known until one day prior to the continued hearing on August the 27th. And you would think that a declaration against his penal interest, which this essentially was, would be looked upon as being more reliable. That's traditionally the way in which these specific sorts of declarations are treated, and that's the rationale behind the exception to the hearsay rule. Right, but we'd have to find that the trial judge had no basis for rejecting the foreperson's declaration on credibility grounds. In other words, even though the trial judge has lived with this person for weeks and weeks and weeks in the course of this very memorable trial, and has watched the person in action, and has had prior dealings which are detailed in the record, you're saying the trial judge still has to hold an evidentiary hearing before the trial judge says, I don't believe that person? Well, there was simply nothing about the demeanor and activities of the foreperson which occurred during the trial, which adversely impacted his credibility. True, he may have been a pain in the rear, to be colloquial about it, and may have irritated the trial judge by virtue of his mannerisms and the way in which he conducted himself, but there was nothing which was untoward, or a violation of his oath, or anything of that sort, which could be pointed to as rendering him ipso facto, simply because he asserts in a declaration against his penal interest that he violated the court's rules, that that in and of itself renders him to be- Right, so you're making an insufficiency of the evidence argument, basically. You're just saying that the trial judge didn't have enough admissible evidence to decide that the foreperson was incredible. Without delving into it more, and the fact that the declaration submitted by the prosecution supports in substantial effects and in substantial quantity the allegations,  We'll get there right now, but I'm talking about Mr. Robinson's own conduct first. With regard to the other jurors, I agree with you that there's other corroborating evidence as to jurors two and nine, but my question about them is what extrinsic evidence did they consider? I mean, every juror brings his or her life experience to the deliberative process. And that's the way the jury system works. And what did these particular jurors do that was anything other than putting the testimony in the context of their own life experience? They did specifically what has been condemned by this court previously in not only Estrada versus Scribner, but Estrada versus Scribner endorsing the Coughlin versus the Taylor Association, where a juror or his close relatives have been personally involved in a situation involving a similar fact pattern, which is what the case was with respect to each of these jurors, juror bias can be implied. And that's specifically and exactly what we had in this particular case. This was not a case such as Grotemeyer versus Hickman, upon which the state relies heavily. In Grotemeyer versus Hickman, we had the statement of a physician juror during deliberations who was applying her professional background and analysis, what she had seen in her practice as a physician, in which she opines then that the defendant in that case, that she'd seen this before. That's an ambiguous kind of a situation or a statement. That the defendant in that case was either retarded or mentally ill, that an insanity defense should have been posited. And finally, that he was gonna receive adequate mental health treatment in prison. Now, all of those things were derived not from her personal experiences as being a victim, as was the case in jurors two and nine, but rather from her professional experience. Now, those types of comments, which were found to be legitimate references to one's life experiences in the Grotemeyer case, stand on a completely different footing from what we're dealing with now. Let me ask you, Mr. McCabe, do I understand correctly that the jury was required to decide whether Rucker's conduct was reasonable under the circumstances? Is that- Well, it had to do with the question of whether or not the underlying offense constituted murder, second degree murder, which she was ultimately convicted of, or attempted manslaughter. And what did that turn on? And that turned on whether or not there was sufficient provocation in the record which would cause a normal person to overreact in the manner in which she did. Okay, given that that's what they have to decide, what would a normal person do in the circumstances? How are they supposed to decide that without reference to what goes on in the world and in their own life experiences and what a reasonable person would be expected to do? How would they do that without reference to their own histories? Well, they are entitled to take into account their understanding of the way in which human beings function by virtue of their past experience in having dealt with people. But isn't that exactly what those jurors did? No, it isn't. What they took was their own personal experience as victims in a certain fact pattern, which is extremely similar to that which they're being called upon to evaluate in this particular case. And they're considering that as evidence. And that is evidence which was not properly admitted. So what could they have done? What could they have done? What could they have considered, yeah. They could have considered everything else, everything else which they had observed in their observations of the way in which other people operate when under stress and could, of course, draw upon that experience in making the determination as to whether or not this was sufficient provocation to push a reasonable person over the edge. They didn't do that. What they did was they substituted themselves and their own experience as being a victim and how they reacted to that situation as evidence. And that is the evidence which didn't come in through the normal ways of the trial into evidence so that it could be confronted and that's the essence of the problem here. That's why the line is drawn where it is. Votenmaier makes that clear that in where it says that not every life experience is grist for the deliberative mill. And with respect to that issue, cites two cases in footnote 23. One being Mott versus Stewart and the other being Mancuso versus Olivares. In Mott versus Stewart, the extrinsic evidence, which was found to be prejudicial and reversible error in that case, was the statement of a social worker to the panel in a case involving a child molest that child sexual victims never lie. Now, she had deduced that from her experience as a social worker, and that was part of her life experience, but that's over the line. But all these other jurors say, well, yes, they did make some comments, but everybody was talking about whether or not this is what a normal person would do, and we didn't see anything special about the comments. I mean, that's what the other jurors are saying in their affidavits. Yes, but that's the part which is inadmissible under the rules of evidence. That is the effect which the statement had upon the other jurors. That is not something which this court can consider. But there's, yeah, there's evidence in the trial, right, as to what a reasonable person would have done. This is not a situation where there's a void in the trial record that the jurors are filling in from their own life experiences and have a hotly disputed issue at trial as to whether Ms. Rucker's response was reasonable. And there's testimony on that. And the jurors are evaluating the testimony. And we all evaluate testimony, judges and jurors and even lawyers. We evaluate testimony through the lens of our life experience. So how do you say, well, you can talk about this life experience, but not that life experience? Or it would have been okay for these two jurors to form a certain opinion, as long as they didn't tell anybody else what the basis of their opinion was? Well, that's specifically what the law is in tailhook association, as endorsed by Estrada versus Scribner. And the Estrada rule is not limited to situations involving a discussion as to what the penalty ought to be or what the sentence is, as the state implies or actually asserts. Rather, Estrada goes to the bias of the juror in question. And where the juror in question, as in this case, jurors two and nine, are making reference to a personal experience as victim of an assault, both sexual as well as physical. And that particular fact pattern, which the juror is relating, is very similar to that, which is at issue in the case before them. Those references are improper. And the law is clear under Scribner that they're improper. The other case- Thank you, counsel. Your time's expired. Thank you. Yeah. May I save my 14 seconds? Actually, you're 14 over. No, that's no problem. That's fine. My job to watch the clock. Thank you. Morning, honors. May it please the Court. Deputy Attorney General Theodore Copley, appearing on behalf of Respondent Atelier. In this case, the fourth person certainly did set forth a declaration. After apparently developing some sort of attachment to Ms. Rucker and visiting her in jail, he set forth what appears to be a litany of misconduct. A litany of things that jurors aren't supposed to do, including his own misconduct in researching her name on the internet and reading articles, as well as alleging some misconduct on the part of other jurors. But the only way to accept that there was misconduct or a presumption of misconduct was if this declaration was credible. Right, but then it is a bit troubling that the trial court didn't just say, well, let's just have an evidentiary hearing, not at all, let's err at all. And without the predicate comments that if you come into my courtroom, I'm going to, it'll be an affair to remember, as I recall him saying. I mean, those are pretty strong threats by a trial judge, that if the juror takes a stand that something bad's going to happen in the form of a criminal prosecution or referral for perjury. So, trial judge makes those comments and says, okay, well, bring him on to testify if you want, and he naturally gets an attorney and doesn't testify, but why not air this at a hearing? What's wrong with that? Well, certainly the trial court's language was off. I mean, I believe that he said the declaration was crap. Yeah. Declaration. And certainly by- It's a term of art in the law. Yeah, absolutely. But unlike the case of Webby, Texas, where the court in that case basically did threaten a juror with prosecution. We don't have that in this particular case. Certainly the judge, outside the presence of the juror, the juror was not present when the court made these harsh comments, which is a distinguishing factor from Webb, but didn't threaten the juror with prosecution. So he said, you know, could be prosecuted, may be in contempt, but the fact that- Well, he said, you better get a lawyer. You better, you know, this is, I'm very serious about it. If you bring him to court and he says these things again, repeating, it would be an affair to remember, basically saying he's going to, I mean, it's a, if I were representing the juror and I read the transcript, I, it'd be hard to say, excuse me, you've got to take the fifth, stay away from that. Well, certainly, and I believe that's the distinguishing factor between this case and Webb. In Webb, the juror didn't have an attorney. Here, certainly the foreperson did have one, who could then, having counsel, could inform him that, listen, it's not up to the judge to prosecute you for these certain things. So make sure that the foreperson's decision to take the Fifth Amendment was well informed and in his own best interest. Well, as Judge Fogel pointed out, there are some credibility determinations, but if you leave those aside, it's pretty tough to make, I mean, just based on the judge's observation of the juror, but if you leave those aside, it's pretty hard to make a credibility finding if you don't see a live witness, isn't it? Well, certainly, but that's exactly what trial court judges do. That's not apparent from the cold record. I mean, the trial court judge sees the eye rolls and the shrugs and the sighs throughout the whole trial, and if the trial court can make that determination that a particular juror or foreperson here is not credible, that's the trial court's call to make. Really, the only thing, the only, you know, counsel says that the other four declarations corroborate a foreperson's declaration. I would disagree with that. They contradict it in almost every single way. The only agreement, if there is agreement, is that jurors two and nine did discuss their life experiences. So even if the foreperson were to take the stand at a hearing, the only thing that he could testify to that would not subject him to perjury was, yes, jurors two and nine discussed some life experiences, and that's exactly what the substance of which the court below found was not misconduct. And I would submit that that's not misconduct. Jurors can use life experiences in determining, in evaluating the evidence. I wonder if we could focus on, I'm trying to remember what this guy said. One thing he said was he didn't know that he could answer no when the jury was polled. Yes, absolutely. The foreperson, in talking about his own misconduct, said that he didn't believe that he could have said no, that I don't believe that this was, this is not my verdict when he was polled. So when polled, he felt he had an obligation to answer falsely. I mean, that's kind of a bizarre statement. It's bizarre, and also he talked about that the jurors discussed the lack of Ms. Rucker's family members as an aspect, something completely contradicted by the other declaration. He said something about looking up a newspaper article that was in the LA Times, I guess. Yes, I believe the San Diego paper looked up that article and researched her name on the internet. Again, contradiction by the other declarations. Well, I mean, they don't know what he looked up. He shot him four times, but was it murderous intent? Yeah, I mean, what does the, I don't understand what the article, even if he read it, exactly would do. He shouldn't have read it, but I mean, the article didn't have anything that was, for example, not before the jury anyway. It's not like it revealed a prior conviction or something like that. Right, and I believe that goes back to the foreperson's credibility, too. That here, the foreperson is admitting that he researched Ms. Rucker's name, read an article about that. But again, the only way to find that that was even misconduct on the part of the foreperson's behalf was if this declaration was credible. And again, based on- Okay, but let's suppose he read the article. What then? Well, Your Honor, I don't even think Mr., or the foreperson alleges that he was prejudiced by this article. I think that's a good- He says he's prejudiced. I think that's what he was trying to help you out. Right. I'm happy that that answered that question. You know, there's the allegation of even taking that as proof. I'm trying to support his crap finding is what I'm- Exactly. Yeah, okay. Yeah, there's nothing that he even alleges in this case. Well, no, he says it affected by some affected negatively. He doesn't really say it would have changed. I mean, it's a declaration of what it is, you know. Right. He may or may not have read it, but we presume he probably did. And again, though, even with that presumption, presuming that, you know, that there was, I mean, who knows what went on with these visits with Mr. O'Connor. Well, I mean, that's, I mean, so the question of a hearing, it's an odd situation where you have a juror that the, that the judge thinks is incredible, a liar, a perjurer, but he can sit on a jury. He's not confident to give testimony afterward because he's, he's not credible. And you know, it's, it's yeah, it tries to, he, he won't testify because he takes the fifth, I mean, it's all pretty bizarre, but- It certainly is, it is- I mean, I think, I think my view is the best practice would have been at a hearing, whether that's reversible on habeas is a whole different matter. Correct, but even, you know, even if it- Especially on a question-by-question basis. He allowed him to make a blanket Fifth Amendment assertion and, and didn't allow the questions as to the specific jurors, which certainly could have come out, I think, without assertion. He might have asserted it, I don't know, but- Well, the, the only way, assuming that the foreperson took, took the stand and was required to assert the Fifth Amendment on a question-by-question basis. The only way that he would not be subjecting himself to perjury, one way or the other, is the only possible thing that he could testify to was that jurors two and nine did discuss their life experiences. Right. I mean, that's what we, we boil everything else away. Aren't we left with that because that seems to be uncontested. Right, and that's, that's what we're left, left with. And, you know, and I, I would submit that really what would we have jurors do? Jurors two and nine could have remained silent and, therefore, violated their oath to, to deliberate. Or they could have participated in deliberations and not told the other jurors that, you know, about their life experiences. But that would still be impossible because even in their own deliberations, their own contributions to deliberations, are necessarily informed by their own life experiences. Here, there's, they were tasked with the, specifically the, the jury instruction, page 8.42, it's in my supplemental excerpt, excerpt of records at page 11. Did task them to determine whether Ms. Rucker's actions were such that those of, of a reasonable person in, in those particular circumstances. So, again, they, the, the jurors here were following the instructions. They were trying to evaluate some conflicting testimony. They had Ms. Rucker in their hand, there was testimony about, you know, possible intoxication or some mental health issues. So what the jurors were, were doing properly is, based on the trial court's instructions, we're trying to determine whether Ms. Rucker acted reasonably. This is really sort of a line drawing question, isn't it? I mean, at some point a, a juror's personal experiences constitute extrinsic evidence. In other words, if you, if you have a doctor on the jury, and the doctor says, oh, by the way, and there's a medical issue in the case, and there hasn't been evidence on it, and the doctor says, well, let me tell you what the medical training I've had tells me about this. That, that would be improper, wouldn't it? That would be, but rather than, than a lie, I believe that's a, a separate, separate thing we're, we're talking about here. Again, if, if an expert of, of whatever sort on a jury would talk about life experiences where there, there was no evidence to, that they were evaluating. Or that they had some personal knowledge of, of the parties, then that would be improper, I, I would agree with that. Or if it had to do with, with sentencing or something of that sort. But here, that, that wasn't the case. They, again. Right, so the, the, the key is that the, you have to have the juror providing evidence that's extrinsic to the record. Exactly. That's, that's, this, because I, I think, I don't even think counsel's arguing that, that a juror's life experience is irrelevant. Or the jurors can't have life experiences because you can never have a jury. So, so, it's, it's what kinds of life experiences are okay to talk about and what's, which, what kinds aren't. And, and I think what we're being asked to do is figure out where the line is. Well isn't, isn't the other question though, not necessarily extrinsic evidence because this was not necessarily extrinsic evidence that the jurors were offering. But rather the question is are they so biased because of their prior experience that they couldn't serve on the jury and therefore they were structural error. I mean, that seems to be the, the, you know, we can evaluate under two different rubrics, one's extrinsic evidence, the other is bias. And again, it, it is, it focuses, it's a matter of line drawing here. If you, where does your personal experience inform and when does it bias? But we'll certainly hear that the jurors didn't believe Ms. Rucker. They didn't believe the, the medical testimony based on, you know, evaluating that from their life experiences. They have every right to do so, to disbelieve a witness, not believing her credibility, to disbelieve an expert on the stand and to express the reasons why they don't believe that with, with the other jurors. I don't believe that's a, that's a bias. That certainly doing what all jurors are tasked to do is to evaluate evidence based on the jury instructions and try to come to some sort of. You didn't necessarily disbelieve her. They may have found that her story, whatever it is, doesn't constitute reasonable grounds to shoot the guy. Certainly, they, they may have a, a, a belief, certainly in some aspects, maybe not, not in others, but they didn't believe that, again, her, you know, her actions rose to a certain level or that she acted as a reasonable person, even if they did accept her, her testimony at, at face value. But certainly may not have believed in the expert's testimony that, you know, someone could go into such a disassociative state of some sort to, to create these kind of actions. And again, that's what we ask jurors to do, to evaluate conflicting evidence, expert testimony, and use, you know, followed by the jury instructions, and then to try to come to some sort of conclusion. And that's exactly what, what the jurors did here. There's no allegation they, they were biased towards, towards Ms. Rucker, that they, they knew anything about this case, knew any parties involved, or. I don't have the briefs in front of me. I have it back upstairs. But is there an allegation in this case on appeal that they shouldn't have been seated as jurors to begin with? No, that's, that's not an allegation on appeal. And I think that the trial court, that was brought up some, somewhat in, in one of these two hearings. And the trial court said, you know, none of these, these women were, were asked a question on board here. Right. They resolved that the question wasn't asked, so they didn't rely on any questions. Right. That would elicit this, this type of response, was asked if they had been victims of a similar type of trial. That'd be a different case if that had happened. Yeah. Exactly, exactly. It would be. So I, I don't believe there's, there's that, that error here, any kind of concealment error here. Simply, whether the, the jurors, when they're tasked with evaluating whether some action is reasonable or not, which jurors are asked to know in many, many criminal cases, how to do that. And I would submit that there's no other way to evaluate whether a particular action or a particular person is reasonable, other than your basis of, of what makes something reasonable or not. And here, here again, it wasn't brought up out of whole block. It wasn't brought up based on, on no evidence. It was just brought up in, in, in some other circumstance. They were specifically evaluating some conflicting testimony based on, on the jury instructions. And I think the four other declarations bear that out. They certainly do say jurors two and nine will discuss some life experiences. But each one of those jurors, those four jurors stated that it was all in the context of what, what a reasonable person would do. Unlike the poor person's declaration, these other declarations denied that these jurors were antagonistic or self-righteous or, or inattentive. But rather, they were part of the, this vigorous debate. Well, that is conflicting. So we don't, we just have to throw that out and just rely on what they said. I mean, the fact that, that they related their experience. Certainly, and again, just, just basing on that, and again, I don't think there's any question that jurors two and nine used their life experiences. But, I mean, again, we submit for the, the reason that. I mean, we're, we're, except for viewing the, the jury face to face, we're in the same position that the state trial judge was in evaluating affidavits. And if they're conflicting, I think you have to look for the parts where they aren't conflicting. Exactly. And that's the question, whether that's enough fun to deny. Right, and I would, I would submit that, that it's not. It's simply that they, they've discussed their life experiences. Again, no, no question really about that. But again, that's proper, and that's what we want jurors to do. Especially in these types of circumstances, whether it's conflicting testimony, conflicting evidence. This is the way that these kind of issues are resolved. I think we have the argument. Any further questions? Thank you both for your arguments. This case has heard, submitted a lot of interesting issues. Thank you both for your presentation. We'll proceed to the next consolidated case on the oral argument calendar, which is Love versus Wilson and Love versus Associated Papers. Do we have Mr. Stelman on the line yet? Yes, your honor, thank you for allowing me to be here by telephone.
judges: Fogel, Thomas, Silverman